Cite as 2019 Ark. App. 427

# ARKANSAS COURT OF APPEALS

DIVISIONS II AND III
**No.** CV-18-893

| | |
|---|---|
| MICHAEL JOHNSON, M.D.; BILL WAGNER; AND ARKANSAS METHODIST HOSPITAL CORP. | **Opinion Delivered:** October 2, 2019 |
| APPELLANTS | APPEAL FROM THE GREENE COUNTY CIRCUIT COURT [NO. 28CV-17-29] |
| V. | HONORABLE MELISSA BRISTOW RICHARDSON, JUDGE |
| ASHLEY BRADLEY AND COREY HUNT, SPECIAL CO-ADMINISTRATORS OF THE ESTATE OF TREY JORDAN HUNT, DECEASED | AFFIRMED |
| APPELLEES | |

## BART F. VIRDEN, Judge

Ashley Bradley and Corey Hunt, special co-administrators of the Estate of Trey Jordan Hunt (Estate), initiated a medical-malpractice action as a result of the death of their infant son Trey. Appellants Michael Johnson, M.D., Bill Wagner, R.N., and Arkansas Methodist Hospital Corporation appeal the Greene County Circuit Court's decision to strike portions of their amended answers in which they sought to allocate fault to a nonparty, the infant's mother, Ashley.

I. *Facts and Procedural History*

On August 22, 2016, three-month-old Trey Hunt was taken to the emergency room by his mother at 4:00 a.m. due to a very high fever, an elevated heart rate, and irritability. Dr. Johnson treated Trey, his fever came down, and he was discharged at 5:48 a.m. Ten

hours after Trey's discharge, Arkansas Methodist Hospital's lab notified its nurse, Wagner, that the lab tests revealed that Trey had streptococcus pneumoniae, bacteria that can cause meningitis and presents a life-threatening emergency if not treated in a timely fashion. Neither Arkansas Methodist Hospital, nor Wagner, nor Dr. Johnson notified Trey's parents of the lab results. Trey became very ill two days later, and his family took him back to the emergency room on August 24, 2016, due to fever and because he had stopped breathing. Trey was transferred to Le Bonheur Hospital in Memphis where he was diagnosed with streptococcus pneumoniae and meningitis, and he died on August 27, 2016.

The Estate filed a complaint for medical negligence against appellants on February 9, 2017, alleging that Trey should not have been discharged and that appellants should have been more diligent in their efforts to contact Trey's family to advise them of the life-threatening medical emergency and instruct them to return to the emergency room.

Appellants' answers were filed in March 2017 and included a litany of affirmative defenses, including comparative fault, intervening cause, act of God, and the obvious-danger rule. When raising these defenses, the attorneys were required to have good-faith legal and factual bases.[1] Scheduling orders set the case for trial beginning on August 20, 2018, and set deadlines for expert-witness disclosures (May 18, 2018, for plaintiffs and June 29, 2018, for defendants), plaintiffs' expert-witness depositions (June 8, 2018), and defendants' expert-witness depositions (July 20, 2018).

At Ashley's deposition on November 28, 2017, she was shown a medical record stating that Trey was to follow up with a family physician "today" (the day she initially took

---

[1] *See* Arkansas Rule of Civil Procedure 11.

2

him to the emergency room), and Ashley testified that Dr. Johnson had told her to take Trey for a checkup but that she had not made Trey an appointment because he was feeling better. On December 15, 2017, Dr. Johnson was deposed and stated that if Trey had continued to be ill after his ER visit, he would have expected Ashley to take him to the doctor's office as directed and that he was "really frustrated" with Ashley because of the inability to get in touch with her. It was undisputed that Dr. Johnson opined that Trey's condition could have been easily fixed if it had been timely and appropriately treated.

Dr. Loren Crown (the Estate's expert) was deposed on May 22, 2018, and he testified that if Ashley had taken Trey to his doctor or back to the ER at any point between Monday at 6:00 a.m. and Wednesday at noon, the outcome could have been different. Further, Dr. Steven Shore (the Estate's expert) was deposed on June 21, 2018, and testified that he believed Trey could have survived if he had received the crucial antibiotic before 7:00 a.m. on August 24, the day that his family brought him back to the ER.

On July 20, 2018, appellants filed separate amended answers, providing notice that they intended to seek to apportion fault to Ashley, Trey's mother, in her individual capacity pursuant to Ark. R. Civ. P. 9(h) naming her as a nonparty at fault in that her failure to follow up with a doctor as instructed was the proximate cause of Trey's death. The Estate filed a "Motion to Strike Defendants' Untimely Amended Answers" on August 6, 2018.

At a hearing on the same day, the trial court noted that the defense's argument that Ashley's failure to take Trey to the doctor could be an intervening cause and would likely

be made to the jury regardless of whether the motion to strike was granted.[2] The trial court also found that it would be prejudicial to allow the amended answers one month before the eight-day trial in that Ashley is a nonparty, is the mother in her individual capacity, and is currently representing the Estate as co-administrator, which would potentially require counsel to be realigned and divided between Ashley as an individual and as co-administrator of the Estate. In granting the motion to strike, the trial court was not persuaded that the expert-witness depositions provided the exact moment that the defense acquired the appropriate factual *and legal* bases to recognize that they needed to seek to allocate fault to the mother. The trial court also found that the facts in the case were well known in advance of that date; thus, notice could have been provided in a more timely fashion. Neither the appellants nor the Estate requested a continuance before the trial court's ruling on the amended answers, and the trial court denied a motion for continuance by the appellants that was made after the motion to strike had been granted.

## II. *Standard of Review*

Our well-established standard of review is that we will not reverse a trial court's decision allowing or denying amendments to pleadings absent a manifest abuse of discretion. *Deer/Mt. Judea Sch. Dist. v. Kimbrell*, 2013 Ark. 393, 430 S.W.3d 29. A court commits an

---

[2]Arkansas Rule of Civil Procedure 9(h), amended in 2014, is a product of Ark. Code Ann. § 16-55-202, enacted in 2003, which was ruled unconstitutional by our supreme court in *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, 308 S.W.3d 135. It is a specific rule of pleading dealing with a specific entity that is not a party to the lawsuit and touches on concepts of contributory negligence, proximate causation, and intervening causation. In terms of its use and application, the rule is still in its infancy. Whether "nonparty fault" is even applicable in this case is not before us, but the trial court recognized the interplay of the concepts when it stated that the "argument is that there was an intervening cause" and it "is a proximate causation issue the defense is making."

4

abuse of discretion when it acts thoughtlessly, improvidently, or without due consideration. *Ramsey v. Dodd*, 2015 Ark. App. 122, 456 S.W.3d 790.

III. *Discussion*

Appellants argue that the trial court abused its discretion in striking their amended answers because the amended answers were filed in accordance with the rules, and when the amended answers were filed, they had only just discovered the *legal* basis of their amended answers, which sought to allocate nonparty fault to Ashley. Furthermore, appellants argue that the trial court abused its discretion in striking the amended answers because the answers posed no prejudice or threat of undue delay.

Arkansas Rule of Civil Procedure 9(h) addresses allocation of nonparty fault and notice and creates the exclusive procedural mechanism for asserting the right to an allocation of nonparty fault created by Ark. Code Ann. § 16-61-202(c) (Supp. 2017). Under Ark. R. Civ. P. 9(h)(2), notice must be given in the original responsive pleading "if the factual and legal basis upon which fault can be allocated is then known" or in an amended or supplemental pleading under Ark. R. Civ. P. 15. The former provisions of Ark. Code Ann. § 16-55-202 required that notice be given no later than 120 days before the trial date, but Ark. R. Civ. P. 9(h)(2) contains no deadline. Although Ark. R. Civ. P. 15 allows amended and supplemental pleadings, the court may, on motion, strike the amended or supplemental pleading or grant a continuance if it determines that "prejudice would result or the disposition of the cause would be unduly delayed."

Appellants' contention that *both* the factual and legal bases were unknown until the completion of discovery in the days leading up to the filing of the amended answers is not

5

substantiated by the record. Ashley's own deposition in the initial phases of discovery revealed that she failed to follow Dr. Johnson's written discharge instruction to take Trey for a follow-up doctor visit later that day, and Dr. Johnson's deposition the next month underscored this premise. The trial court found that the circumstances prior to the May 2018 expert-witness depositions, specifically, the hospital's own medical records with respect to Ashley's instructions to follow up with the doctor, constituted the requisite factual and legal bases under Rule 9(h)(2) upon which fault could be allocated. Being unpersuaded that the expert depositions were the exact moment that appellants had the appropriate factual and legal bases to recognize the need to seek an allocation of nonparty fault against the mother, the trial court found that the facts were known well in advance of that date and that notice could have been provided in a much more timely manner.

The trial court declined to impose a requirement that the legal basis to assert the fault of another person—a layperson—must be established by expert testimony, and we likewise decline to impose this requirement. To do otherwise, as suggested by the dissent, would "elevate" contributory negligence or intervening causation to a claim for medical negligence against nonmedical personnel. Neither the legislature nor the courts have done so, and we decline to do so now. The trial court did not abuse its discretion by finding that the legal basis of an allegation of nonparty fault against Ashley could be borne out of her own testimony and the testimony of her child's emergency-room physician that she failed to follow discharge instructions, both of which were revealed early in discovery.

Appellants next take issue with the trial court striking portions of their amended answers, asserting that the amended answers posed no prejudice and would not have caused

undue delay. The decision to strike an amended pleading and the determination of whether prejudice or undue delay would result are matters of the trial court's broad discretion. *Mfrs. & Traders Tr. Co. v. Nickelson*, 2011 Ark. App. 557, 386 S.W.3d 41. Furthermore, we recognize that a trial court has an obligation to manage and control its docket in an efficient manner. *Odaware v. Robertson Aerial-AG, Inc.*, 13 Ark. App. 285, 683 S.W.2d 624 (1985).

Giving due consideration to appellants' point, the trial court found that prejudice would result if the amended answers were allowed, that the disposition of the cause would be unduly delayed, and that a conflict would ensue only shortly before trial with respect to the Estate's counsel if it were to permit the amended answers. We cannot say that the trial court acted improvidently, thoughtlessly, or without due consideration; accordingly, we affirm.

Affirmed.

ABRAMSON, HIXSON, and MURPHY, JJ., agree.

HARRISON and KLAPPENBACH, JJ., dissent.

**BRANDON J. HARRISON, Judge, dissenting**. This appeal turns partly on what the phrase "factual and legal basis" means in Arkansas Rule of Civil Procedure 9(h)(2), because those words determine when the nonparty-fault-allocation defense must first be raised if a party hopes to instruct a fact-finder on the defense at trial. Arkansas's first effort at defining the contours of *when* a party must provide the mandatory notice under Rule 9 comes in a case where the nonparty-fault issue is bound to the question, "Who, if anyone, is partially or wholly responsible for the fatal course an infectious disease took in a young child?" Some

broad principles relating to Rule 9(h)'s application have gained an initial footing today. The bench and bar should take note.

## I.

Let us turn to the circuit court's ruling and begin the analysis:

> I want to be clear that what I am striking is the amendment that contains the notice set forth for Rule 9(h) on allocation of non-party fault identifying the mother as a non-party pursuant to 16-61-202 that the defendants have placed on notice through this July 20th filing.
>
> That is what I'm striking, and that is what I'm finding as prejudicial under Rule 9(h). I want to be clear that the rule specifically states that notice shall be given—and that is shall—shall be given in the initial responsive pleading if the factual and legal basis upon which faults can be allocated is then known or in an amended pleading pursuant to Rule 15 after the party discovers that information.
>
> That information is the factual and legal basis. What defense counsel is arguing to me is that the factual basis was unknown to the defense until the May 2018 deposition that they did not receive the transcript for until about a month after that, so June of 2018. They are basing that based upon the deposition testimony of Plaintiffs' expert, Dr. Lorne Crown; which the record will reflect I heard multiple motions from defense counsel as to the hyperbole, the unreliability, the basic concern that defense had with this specific expert.
>
> But be that as it may, the Rule 9(h) talks about factual basis. The facts of this matter were not disclosed to the defense by the plaintiff's expert's testimony in May of 2018. Instead, I have heard evidence; I have seen the medical records. The piece of evidence that I think is most indicative of where this argument with respect to proximate cause or intervening cause would focus is the discharge instructions to the mother that she should follow up with her doctor, follow up with the child's doctor.
>
> That is a factual circumstance. It is a fact in this case. The alleged new information that the doctor, the expert, would have provided to defense counsel in May of 2018, according to Ms. Browning, is that this window might have been broader on the final day in question than they might have otherwise recognized it to be.
>
> I am not finding that information coming in May of 2018 from the plaintiffs' identified expert, two years or close to two years after this event,

after all of these depositions, after the hospital's own medical records with respect to the mother's instructions to follow up with the doctor—I'm not finding that circumstance constitutes under Rule (h)(2) the factual and legal basis upon which the fault can be allocated.

To put it another way, I am not persuaded that was the moment that the defense had the appropriate factual and legal basis to recognize that they needed to seek to allocate fault to the mother. Instead, I'm finding that the facts in this case were known well in advance of that date, and that the notice could have been provided in a much more timely fashion.

And that, again, pursuant to the reporter's note to Rule 9, it is discretionary with the Court to not allow this to occur and to strike the amended or supplemental pleading if the Court determines that prejudice would result or the disposition of the [case] would be unduly delayed.

Both of those are at issue here. I have articulated that there could be a conflict—not could be; I recognize a conflict would ensue two weeks before trial with respect to Plaintiffs' counsel if I were to allow this to happen. And if I were to postpone this matter because of this amendment at this time, that would constitute an undue delay.

For those reasons, my ruling stands.

The circuit court struck the defendants' Rule 9(h) nonparty-fault defenses from their amended answers for two main reasons. First, it did not accept the defendants' argument that they needed expert-witness testimony before the finger of fault could arguably be pointed toward the mother by using the allegation that her failure to follow the discharge instruction contributed to the infection taking the deadly course that it ultimately did inside Trey's body. Second, the court decided that the plaintiffs would be prejudiced and an undue delay in the trial proceedings would have occurred had the amendments been allowed.

The circuit court believed the "factual and legal basis" for the Rule 9(h) defense arrived sooner in the case, though it did not identify the pivotal moment at which time the

9

defendants had a factual and *legal* basis to give notice of their intention to assert the nonparty-fault defense. The court emphasized some facts. But it did not adequately explain why the noted facts were *legally relevant* to whether Trey's mother was at least partially at fault for her son's death absent expert testimony to that effect.

> I am not persuaded that that was the moment that the defense had the appropriate factual and legal basis to recognize that they needed to seek to allocate fault to the mother. Instead, I'm finding that *the facts* in this case were known well in advance of that date, and that the notice could have been provided in a much more timely fashion.

The "that" to which the court referred was the appearance, in May 2018, of plaintiffs' experts' deposition testimony which, in the defendants' view, implied that Trey's mother contributed in some measure to her son's physical decline. More specifically, the court rejected the defendants' argument that unless and until there was some medical-expert testimony that arguably supported the contention that the mother's conduct might be partly or wholly to blame for what happened to her son—as a matter of medical science and clinical experience—then there was no *legal* basis on which the defendants could have raised nonparty fault against Trey's mother.

Today's majority opinion states,

> The trial court declined to impose a requirement that the legal basis to assert the fault of another person—a layperson—must be established by expert testimony, and we likewise decline to impose this requirement.

The majority's rule that expert testimony is not required when a defendant pursues a nonparty-fault allocation against a layperson is too inflexible and breaks faith with current law. Whether expert testimony will be required to establish "fault" in a case must be determined on a case-by-case basis. The circuit court and now this court have implicitly

10

held that Arkansas Rules of Evidence 702 and 704 do not apply to nonparty-fault issues involving a layperson. I respectfully disagree.

The nonparty-fault issue in this case cannot be fairly decided absent expert testimony. In fact, the need for expert testimony is at its zenith. The plaintiffs claim that the defendants committed medical malpractice and caused Trey's death. In particular, the plaintiffs allege that each defendant had a standard of care to meet, that each defendant breached the respective standard owed to Trey, and that one or more breaches of the standards of care proximately caused the child's injury (death). At least one expert medical witness would be required to carry the plaintiffs' statutory burden of proof. Ark. Code Ann. § 16-114-206 (Repl. 2016). How to assess, diagnose, and treat a pediatric patient who has a serious infection and how to communicate diagnostic findings to the patient's family are issues laypeople cannot determine using their common experience and knowledge. No one contends otherwise. That is why the plaintiffs expended the time, effort, and expense of procuring expert witnesses in the first place.

Why then isn't expert testimony required before the defendants can, with some *legal justification*, point the finger of fault toward the mother? Did the alleged injury fundamentally change? No. Did the medically relevant facts concerning Trey's disease and death suddenly change because a layperson's decision rather than a medical-care provider's decision became the focus of "fault?" No. More particularly, did the issue of causation fundamentally change? No. The causation issue, whether it pertains to plaintiffs versus medical-care providers or the medical-care providers versus Trey's mother, is, at bottom, the same: did X, Y, or Z's decisions proximately cause or contribute to Trey's death? The

11

individual decisions that each party or nonparty made will, of course, vary. Expectations regarding how each person should or should not have acted will also vary. But the ultimate question of whose conduct contributed to the *medically relevant cause(s)* of Trey's death is at the heart of the dispute. It cannot be otherwise. The issue of causation must therefore be based on competent expert-witness testimony because only a medical professional can inform the fact-finder on the matters that are outside of its experience and knowledge. *E.g.*, Ark. R. Evid. 702 & 704 (2018).

Laypeople are not steeped in current scientific knowledge and clinical practices concerning pediatric medicine, including how medical-care providers procure and report important diagnostic findings to pediatric patients' families. More specific to the nonparty-fault issue here, laypeople cannot reliably determine whether a parent's delay in returning a child in Trey's condition for further treatment was medically important to his deterioration.

Even personal-injury cases outside the medical-malpractice context that involve lay plaintiffs suing lay defendants have long needed expert testimony (at times) for a party to prevail on core issues. In these laypersons cases there is still "a decided tendency to permit the fact-finder to hear the testimony of persons having superior knowledge in the given field, unless they are clearly lacking in training and experience." *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 372, 268 S.W.3d 905, 914 (2007) (permitting a chiropractor to give expert-witness testimony in a personal-injury case on the cause of the plaintiff's injuries); *see also Dundee v. Horton*, 2015 Ark. App. 690, 477 S.W.3d 558 (recognizing that expert medical testimony was needed for the plaintiff, who was injured in a car wreck, to establish the defendant proximately caused the alleged injuries).

12

The majority believes that Dr. Johnson's deposition testimony helped provide the factual and legal bases for a nonparty-fault-allocation notice. But the doctor is a party defendant and cannot be compelled to provide expert-witness testimony during the trial. Ark. Code Ann. § 16-114-207 (Repl. 2016). Dr. Johnson's statements as a fact witness cannot therefore be a legal basis upon which a Rule 9(h)(2) notice was triggered in this case.

II.

The circuit court's decision to reject the defendants' argument that they needed expert-witness testimony before they could raise the nonparty-fault defense against Trey's mother is but half the analysis. The second reason the court struck part of the defendants' amended answers is because it ruled allowing the amendments would prejudice the plaintiffs and unduly delay the case. That analysis is required because Rule 9(h)(2) is tied to Arkansas Rule of Civil Procedure 15. "Notice shall be given in the initial responsive pleading, if the factual and legal basis upon which fault can be allocated is then known, or in an amended or supplemental pleading subject to the requirements and conditions of Rule 15 after the party discovers that information." Ark. R. Civ. P. 9(h)(2) (2018).

Rule 15(a) embodies a liberal amendment policy. It does not contain a time limitation. The default rule is that amended pleadings are broadly permitted at any time without leave of the court. *E.g.*, *Mullen v. Shockley*, 2009 Ark. App. 855. A circuit court has broad discretion to allow or disallow an amendment. *Turner v. Stewart*, 330 Ark. 134, 952 S.W.2d 156 (1997). But a court abuses its discretion when it strikes an amended pleading when no prejudice and no undue delay results. *Cavalry SPV, LLC v. Anderson*, 99

13

Ark. App. 309, 260 S.W.3d 331 (2007). Moreover, if the party opposing an amended pleading fails to seek a continuance, that decision is placed in the prejudice calculus. *Id*.

Whether an amended pleading would prejudice a party depends on the amendment's potential impact on the litigation. *Travis v. Houk*, 307 Ark. 84, 86, 817 S.W.2d 207, 208 (1991) (stating that the test for prejudice is "whether the party opposing the [amendment] will have a fair opportunity to defend after the amendment"). Whether or not a party's trial strategy will be materially hampered informs how the prejudice test should be answered.

Here, the plaintiffs were not prejudiced when the defendants raised the nonparty-fault defense. By the circuit court's own admission, the mother's acts or omissions were likely going to be presented during the trial even if the Rule 9(h) defenses were struck. The court so recognized during the hearing on the motion to strike, during which it said: "The piece of evidence that I think is most indicative of where this argument with respect to proximate cause or intervening cause would focus is the discharge instructions to the mother that she should follow up with her doctor, follow up with the child's doctor." To be clear, even after the Rule 9(h) defenses were struck by the court, it still acknowledged that the mother's decisions would remain part of the causation analysis.

The bottom line is that the plaintiffs' ability to seek money damages against the defendants and to challenge the nonparty-fault defense was never meaningfully curtailed or adversely affected.

Moving to the plaintiffs' conflict-of-interest point, the circuit court said this,

> I have articulated that there could be a conflict—not could be; I recognize a conflict would ensue two weeks before trial with respect to Plaintiffs' counsel if I were to allow this to happen. And if I were to postpone

14

this matter because of this amendment at this time, that would constitute an undue delay.

The prejudice the circuit court identified was that the defendants created a conflict of interest for the plaintiffs when the defendants raised the Rule 9 defense. Even assuming for the sake of argument that the plaintiffs' perceived conflict of interest is the defendants' legal problem, neither the plaintiffs nor the circuit court nor this court have provided one citation to any authority addressing, much less resolving, the conflict-of-interest point in a way that supports the circuit court's decision. No one discussed whether the perceived conflict could have been waived in relatively short order. No one attempted to state how long it might have taken to resolve the perceived conflict if it could not be waived. These avenues were not even explored.

We should not make any decision today on this highly important—and wholly undeveloped—issue.

Setting aside the conflict-of-interest angle, did the defendants' decision to raise a defense portend an "excessive or unwarranted" delay? *See Black's Law Dictionary* (11th ed. 2019) (defining "undue"). I can only answer no. The defendants' amended answers containing the Rule 9(h)(2) notices were filed on July 20, approximately one month before the scheduled August 20 trial date and one day after the final deposition was concluded. As the majority concedes, the parties conducted discovery in accord with the amended scheduling order. No party claims that the scheduling order was breached or that the court disallowed the nonparty defense due to any violation of any scheduling order or as a result of a discovery violation. Rule 9(h) itself contains no deadline by which to assert nonparty fault. So part of any delay was the natural consequence of the circuit court's own scheduling

15

order and the parties' respective adherence to it. That should not be held against either the plaintiffs or the defendants.

No excessive or unwarranted delay was established as a matter of fact. As I understand the record, the circuit court did not look at its calendar and inform itself and counsel—even in some rudimentary fashion—how long it might be before another significant block of time could be set aside to try the case before it accepted the undue-delay argument. One cannot decide whether a time delay is excessive without at least knowing how long the delay will likely be. And as I have mentioned, no one discussed in any detail on the record how long it might take plaintiffs' counsel to resolve the perceived conflict—assuming for the sake of argument that there even was one and that it could deprive the defendants of a Rule 9(h) defense.

Finally, the failure of the opposing party to seek a continuance is a factor to be considered in determining whether prejudice is shown. Here, the circuit court expressly found, "No one is asking me to grant a continuance." The plaintiffs did not move to continue the case. They instead relied on the undeveloped assertion of a conflict of interest.

To sum up, unless a demonstration of prejudice or undue delay of a sort that reeks of an injustice is established, and unless a party challenging an amendment seeks a continuance, then the proposed amendment should be allowed. The plaintiffs did not come close enough to successfully challenging the defendants' amendments given this record. Rule 9 was satisfied, and Rule 15 favored the amendments.

## III.

The circuit court's decision to grant the motion to strike the defendants' nonparty-fault defenses from their amended answers was an abuse of discretion that should be reversed, not affirmed.

KLAPPENBACH, J., joins.

*Wright, Lindsey & Jennings LLP*, by: *David P. Glover, Gary D. Marts, Jr.*, and *David C. Jung*, for separate appellant Dr. Michael Johnson.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Michelle L. Browning* and *Jason T. Browning*, for separate appellants Arkansas Methodist Hospital Corporation and Bill Wagner.

*Wilcox Law Firm*, by: *Tony L. Wilcox*; and *Scholtens & Averitt, PLC*, by: *Chris A. Averitt*, for appellees.